[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The court rendered a decision on this appeal dated September 6, 2001, sustaining the plaintiff's appeal. On September 25, 2001, the Connecticut Supreme Court officially released its decision in the matter of QueachCorp. v. Inland Wetlands Commission, 255 Conn. 178,___ A.2d ___ (2001). That decision was available by advance publication prior to September 25, 2001, but after September 6, 2001. The defendant, Inland Wetlands Commissioner of the Town of Wilton, and the Commissioner CT Page 840 of Environmental Protection each filed a Motion to Reargue the court's decision in this matter, in light of the Queach decision. The Town's motion was dated September 23, 2001; the Commissioner's motion was dated September 24, 2001. The plaintiff, Avalonbay Communities, Inc. filed an objection to the Motion to Reargue on October 1, 2001. The court granted the Motion to Reargue. Reargument was heard October, 2001. It focused on the issue of the applicability of the QueachCorp. decision to the appeal in this matter.
 I Procedural history
Avalon commenced this appeal on April 13, 2000, by service of process on Wilton's town clerk, chairman of the commission and on an associate attorney general. On April 20, 2000, Avalon filed its appeal in the Superior Court, judicial district of Stamford-Norwalk at Stamford. On May 4, 2000, Avalon moved to transfer this appeal to the Superior Court, judicial district of New Britain, arguing that the commission improperly asserted jurisdiction over the revised site plan and then denied the application for the purpose of preventing the development of affordable housing in Wilton.[1] On May 15, 2000, the motion to transfer this appeal was granted by the court. The commission filed a motion to transfer this appeal back to the Superior Court, judicial district of Stamford-Norwalk, which motion was denied by the court, Cohn, J.
The commission filed its answer on June 30, 2000 and return of record on July 12, 2000. On August 18, 2000, the commissioner for the Connecticut department of environmental protection (DEP) entered his appearance and filed an answer to Avalon's appeal. Avalon filed its brief on September 6, 2000. The DEP filed its brief on September 20, 2000 and Avalon filed a revised brief on October 2, 2000. The commission filed its brief on November 6, 2000 and Avalon filed a reply brief on December 8, 2000. On May 11, 2001, the court heard Avalon's administrative appeal. On July 17, 2001, a site walk was conducted.
 II
CT Page 841 Facts
On November 24, 1999, Avalon filed a wetlands permit application with the commission seeking to eliminate all regulated activities proposed in its original site development plan.[2] Avalon is a Maryland corporation with a place of business in Wilton, Connecticut. Avalon has a contract to purchase a 10.6 acre parcel located on the east side of Route 7, south of the intersection with Routes 7 and 33 in Wilton, known as 116 Danbury Road, Wilton, Connecticut (the subject property). The subject property is owned by James and Marilyn O'Halloran and is zone R-1A (single family detached homes of lots at least one acre). The subject property is bordered to the north by Wilton Hills, an eighteen unit multifamily residential development; to the east by single family residences off of Route 33; on the west by Route 7 and on the west side of Route 7 by a variety of commercial and industrial uses.
Adjacent to the Wilton Hills development, the subject property contains approximately .32 acre of inland wetlands, comprising two areas, which are level to very gently sloping. Wetland 1 is a .30 acre deciduous wooded wetland in the northwest portion of the subject property and is located in a shallow depression with moderate vegetation growth, dense canopy cover and moderate to sparse shrub and herbaceous growth. An intermittent watercourse flows through Wetland 1 from east to west and the watercourse was previously ditched. The watercourse channel is approximately five feet wide and has a fine sandy substrate. Wetland 2 is a .02 acre deciduous wooded wetland in the northeast portion of the subject property. surrounded by wooded upland. Wetland 2 continues off-site to the east, where it is associated with a small pond. The surface of the wetland contains rocks, has a dense canopy cover and shrub understory. The herbaceous vegetation growth within the wetland is sparse.
In its original application to Wilton's PZ, Avalon proposed to construct 119 rental units, with twenty-five percent (or 30) units designated as affordable housing, as that term is defined by General Statutes §8-30g.[3] In connection with this zoning application, CT Page 842 Avalon applied to the commission for a permit to relocate an existing driveway farther from the regulated areas, requiring 160 cubic yards of disturbance, and to install overflow piping from water quality and stormwater detention structures in two locations, requiring 25 cubic yards of excavation and backfilling.
To address the commission's concerns, stated in its denial of Avalon's initial permit application the November 24, 1999 permit application that is the subject of this appeal contains no proposed construction within fifty feet of the wetland area or one hundred feet from the drainage ditch/watercourse of Wetland 1 and no site plan activities are proposed in any areas surrounding the off-site wetlands or watercourses. The subject permit application is supported by a November 22, 1999 revision of an environmental assessment report prepared by Soil Science and Environmental Services, Inc. which concludes that Avalon's proposed planned residential development on the subject property was "reviewed and found to cause no direct or indirect wetland or watercourse and waterbody impacts affecting the regulated areas on-site or off site."
As part of its revised application for a permit, Avalon requested the commission to issue a declaratory ruling that the application did not require a permit because there were no regulated activities associated with Avalon's proposed plans for the subject property. The commission held a hearing on this request on December 9, 2000.[4] The commission could not tell from the presentation made by Avalon at the December 9, 2000 meeting what the impacts would be to the wetlands and watercourses and felt that it was aware of significant public interest in the project to warrant holding a public hearing on the revised application pursuant to General Statutes § 22a-42a (c)(1)[5]
and § 9.1 of the Wilton Inland Wetlands and Watercourse regulations.[6]
The commission held a public hearing on January 4, 2000, and continued the hearing to February 10, then to February 24. The hearing was closed following receipt of more information at the February 24, 2000 hearing. During these hearings, the commission heard from Patricia Sesto, Wilton's director of environmental CT Page 843 affairs; Eric Alletzhauser, the attorney representing Avalon; John Milone and Andy green, professional engineers with Milone MacBroom, who worked on the project; Kenneth Stevens and Jennifer Beno, Soils Science and Environmental Services; Ravi Malviya, a geological engineer with Barakos-Landino; Eric Mas, an enviromnental engineer with Fuss O'Neill, who reviewed Avalon's revised site plan for Wilton; Dr. Michael Klemens, a herpetologist who discussed the wetland and upland habitat needs of salamanders; and George Logan, a principal with the environmental scientists with Rema Ecological Services who provided Avalon's counterpoint to Dr. Klemens' findings.
At its March 9, 2000 meeting, the commission, by a vote of four to two, directed the staff to draft a resolution denying Avalon's permit application for failure to satisfy the inland wetlands regulations, specifically §§ 10.2a, 10.2b, 10.2d 10.2e, 10.2f, 10.2g and 10.3. Referring specifically to § 10.3 of the inland wetlands regulations, the commission cited Avalon's failure to demonstrate that there exists no feasible and prudent alternative which would have less impact on the salamander population and the commission suggested that Avalon could meet its burden under this section by demonstrating more conclusively that, based on expert study at the optimum time of year, the spotted salamander population either does not exist on the site, or exists in such small numbers that the experts consider the population to be terminal. On March 23, 2000, the commission voted four to two to adopt the denial drafted by the staff and notice of the denial was published in the Wilton Villager on March 30, 2000.
 III Jurisdiction
General Statutes § 22a-43 governs appeals from decisions of inland wetlands commissions and the court acquires and maintains jurisdiction only when the plaintiff complies with all relevant provisions of the statute. Munhall v. Inland Wetlands Commission,221 Conn. 46, 50, 602 A.2d 566 (1992) ("[i]t is fundamental that appellate jurisdiction in administrative appeals is created only by statute and CT Page 844 can be acquired and exercised only in the manner prescribed by statute").
 A Aggrievement
Pursuant to General Statutes § 22a-43, "any person aggrieved by any regulation, order, decision or action made pursuant to sections 22a-36, to 22a-45, inclusive . . . may, within the time specified in subsection (b) of section 8-8 . . . appeal to the superior court. . . ."
"Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. . . . We traditionally have applied the following two part test to determine whether aggrievement exists: (1) does the allegedly aggrieved party have a specific, personal and legal interest in the subject matter of a decision; and (2) has this interest been specially and injuriously affected by the decision." (Citations omitted; internal quotation marks omitted.) Gladysz v. Planning Zoning Commission,256 Conn. 249, 255-56, ___ A.2d ___ (2001). "Aggrievement is a question of fact for the trial court and the plaintiff has the burden of proving that fact." (Internal quotation marks omitted.) Water PollutionControl Authority v. Keeney, 234 Conn. 488, 493,662 A.2d 124 (1995).
Avalon alleges that it is aggrieved as the contract purchaser of the subject property from the O'Hallorans. At the hearing on Avalon's appeal on May 11, 2001, the parties stipulated that Avalon has a contract with the O'Hallorans to purchase the subject property and that the O'Hallorans have owned the subject property continuously and without interruption from May 26, 1999, the date of Avalon's initial application to the commission, to the date of the stipulation. Avalon's representative testified that Avalon entered into a one year contract with the O'Hallorans to purchase the subject property after a due diligence period in 1999, extended the contract for twelve months after the initial one year and extended the contract to purchase CT Page 845 again in February, 2001.[7]
Prospective purchasers of property may be aggrieved by an administrative agency's decision. Bethlehem ChristianFellowship, Inc. v. Planning Zoning Commission,58 Conn. App. 441, 445, 755 A.2d 249 (2000). Because Avalon contracted to purchase the subject property from the O'Hallorans, subject to receiving the appropriate permits from the town, it possesses the requisite legal interest to establish aggrievement. Denial of Avalon's permit application by commission impairs Avalon's ability to develop the subject property and, therefore, "specially and injuriously" affects its legal interest.Gladysz v. Planning Zoning Commission, supra,256 Conn. 255-56. Accordingly, the court finds that Avalon has established aggrievement for the purposes of General Statutes § 22a-43.
 B Timeliness and Service of Process
An administrative appeal must be "commenced by service of process . . . within fifteen days from the date that notice of the decision was published. . . ." General Statutes § 8-8 (b). "Notice of such appeal shall be served upon the inland wetlands agency and the commissioner [of environmental protection]." General Statutes § 22a-43 (a). The commission published notice of its denial of Avalon's permit application in the Wilton Villager on March 30, 2000. Avalon commenced this appeal on April 13, 2000, by service of process upon Joan Maude Ventres, town clerk, Howard Naylor, chairman of the commission and Jane Scholl, associate attorney general, on behalf of the DEP which is less than fifteen days after the commission published notice of its denial of Avalon's permit application on March 30, 2000. This appeal, therefore, is timely and the proper parties were served, pursuant to General Statutes §§ 8-8 (b), 22a-43 (a).
Accordingly, the court has jurisdiction to hear and decide this appeal.
 IV
CT Page 846 Scope/Standard of Judicial Review
"The purpose of the Inland Wetlands and Watercourses Act (act) is to provide an orderly process in which the rights of landowners to use or develop their land can be balanced with the need to protect the invaluable public resource of wetlands. See General Statutes § 22a-36. The statute, and the regulations adopted to implement it, provide for an application and hearing process through which these competing interests are balanced. See General Statutes § 22a-42a." Woodburn v.Conservation Commission, 37 Conn. App. 166, 170,655 A.2d 764, cert. denied, 233 Conn. 906, 657 A.2d 645
(1995).
In an appeal from the decision of an inland wetland commission, the appealing party bears the burden of proving that the commission acted improperly. Newtown v.Keeney, 234 Conn. 312, 319, 661 A.2d 589 (1995); Samperiv. Inland Wetlands Agency, 226 Conn. 579, 587-88,628 A.2d 1286 (1993). "The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. . . ." (Internal quotation marks omitted.) Newtown v. Keeney, supra,234 Conn. 319.
"In reviewing [a] decision made pursuant to the act, the reviewing court must sustain the [commission's] determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to CT Page 847 provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Internal quotation marks omitted.) Newtown v. Keeney, supra, 234 Conn. 319-20.
"When deciding matters involving technically complex issues, e.g., pollution control, the board must base its decision upon reliable, probative evidence, typically expert, for the nature and probability of any potential adverse impact on the wetlands. Feinson v. ConservationCommission, 180 Conn. 421, 429, 429 A.2d 910 (1980)."Avalon Bay Communities, Inc. v. Inland Wetlands andWatercourses Commission, Superior Court, judicial district of New Britain, Docket No. 492660 (August 12, 1999, Munro, J.). "In short, we may not substitute our own conclusions for those of the commission. Rather, we are limited to determining whether the commission's conclusions of fact were unreasonable, arbitrary, illegal or an abuse of discretion." (Internal quotation marks omitted.) Sweetman v. State Elections EnforcementCommission, 249 Conn. 296, 332, 732 A.2d 144 (1999).
 V Discussion
In Queach Corp., the Connecticut Supreme Court was called on to decide inter alia whether certain regulations promulgated by the Inland Wetlands Commission of the Town of Branford were factually valid and in compliance with General Statutes §§ 22a-38 and22a-42a, as amended. The court held that the regulation's definition of a regulated activity was in compliance with the law. The regulations at issue in CT Page 848 Branford are substantially similar to the corresponding Wilton regulation. The Branford regulation provides that the area subject to the Commission's review, means any "[r]egulated activity . . . (l) on land within 100 feet measured horizontally from the boundary of any wetland or watercourse, provided (2) The Agency may rule that any other activity located within such upland review area or in any other non-wetland or non-watercourse area is likely to impact or affect wetlands or watercourses and is a regulated activity."
Similarly, the regulation at issue in the instant matter as adopted by the Inland Wetlands Commission of the Town of Wilton, provides: "Regulated area" means any activity of operation within or use of a wetland, watercourse or regulated area, as defined herein. . . . 2. Area immediately adjoining wetlands and watercourses in the Town of Wilton as this area is needed to provide protection from the adverse impacts of unregulated land uses. The minimum distance is fifty (50) feet from wetland, and the hundred (100) feet from the edge of watercourses. . . ." [Emphasis added].
In Queach Corp., the court, stated in dicta which is equally applicable here:
 "In evaluating the plaintiffs' claims, we are mindful that the [act] rests upon a specific legislative finding that [t]he inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed, and that [t]he preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state. General Statutes § 22a-36. Accordingly, the broad legislative objectives underlying the [act] are in part to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution . . . [and by] protecting the state's potable fresh water supplies from the dangers of drought, overdraft, pollution, misuse and CT Page 849 mismanagement by providing an orderly process to balance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology in order to forever guarantee to the people of the state, the safety of such natural resources for their benefit and enjoyment of generations yet unborn. General Statutes § 22a-36.
 "In order to accomplish these objectives, it is the public policy of the state to require municipal regulation of activities affecting the wetlands and watercourses within the territorial limits of the various municipalities or districts. General Statutes § 22a-42 (a). The designated wetlands agency of each municipality is expressly authorized to promulgate regulations that are necessary to protect the wetlands and watercourses within its territorial limits. General Statutes § 22a-42 (c). A regulation deemed necessary by a wetlands agency is not inconsistent with the [act] so long as it is reasonably designed to effectuate the stated purposes of the wetlands statutes. Cioffoletti v. Planning Zoning Commission, 209 Conn. 544, 561, 552 A.2d 796
(1989) [overruled on other grounds, 220 Conn. 362, 599 A.2d 9 (1991)]. The [act] envisages its adaptation to infinitely variable conditions for the effectuation of the purposes of these statutes. Aaron v. Conservation Commission, 183 Conn. 532, 541, 441 A.2d 30
(1981).
 "While the necessity for protecting wetlands must be balanced against the productive use of privately owned land; Red Hill Coalition, Inv. v. Conservation Commission, 212 Conn. 710, 719, 563 A.2d 1339 (1989); we have also indicated that this balancing process is more appropriately conducted in a legislative rather than a judicial setting. Lizotte v. Conservation Commission, 216 Conn. 320, 336, 579 A.2d 1044 (1990). As a consequence, the commission is vested with a large measure of discretion, and the burden of showing that the agency has acted improperly rests upon the one who asserts it. Id., 336-37, quoting Aaron v. Conservation Commission, supra, [183 Conn.] 537.
Specifically, in Queach, the Court noted at fn. 23, "We note that proposed activities in or near wetlands or watercourses would come before CT Page 850 the commission through an application by a developer. If the developer proposes regulated activities outside the boundaries of the established upland review area, and if that activity, such as extensive earth movement, is likely to impact the wetlands. Then regulation of that activity also may be appropriate under the same test used for activity outside of the wetlands but within the 100 foot setback area."
It would appear that the Court has determined that, regardless of where the upland activities are contemplated, the Commission may exercise jurisdiction. In exercising jurisdiction, it must initially make a determination whether the activity is "likely to impact the wetlands." If the answer is in the affirmative, then the Commission may regulate the activity, just as it would within a setback area.
This court had initially determined that the reading of the IWWA urged by the DEP and commission was too broad. In light of Queach, the court reverses that conclusion. Instead the court concludes that the commission was correct in exercising jurisdiction over the appellant's proposed activities at the site. Given the Supreme Court's reading of the intent of the legislature in passing the IWWA, the court finds, based on the record, that Avalon's November 24, 1999 permit application involves activities that may detrimentally affect the wetlands associated with the subject property. Consequently, Avalon's application is subject to Wilton's regulatory oversight. "[I]nland wetland commissions can now exercise jurisdiction outside their jurisdictional boundaries if activities on `unregulated' land would affect wetlands. . . . Similarly, a commission can impose a condition of off site compensation of wetlands lost as long as it considers the impact of the application on the subject property. . . . Finally, the general purpose of the act has also been found to permit an agency to assert jurisdiction over land use distant from its jurisdictional boundaries. Mario v. Fairfield, supra, [217 Conn. 164,] 171 [585 A.2d 87 (1991)]. (Citations omitted; internal quotation marks omitted.)" Ahearn v. Inland Wetlands Agency-ConservationCommission, 34 Conn. App. 385, 391, 641 A.2d 812, cert. denied,230 Conn. 911, 645 A.2d 1015 (1994).
Accordingly, the court finds that the commission properly exercised jurisdiction by reviewing Avalon's permit application and issuing a decision thereon.
 B Evidence in the Record of Impact on a Wetland or a Watercourse
Avalon argues that there is not substantial evidence in the record to support the commission's denial of its permit application. General CT Page 851 Statutes § 22a-42 sets forth the functions and responsibilities of municipal inland wetlands agencies.[8] The jurisdiction "of an inland wetlands agency is extremely limited in that it can consider only matters that impact on designated wetlands areas." Tanner v. ConservationCommission, 15 Conn. App., 336, 339, 544 A.2d 258 (1988). In reviewing permit applications, the commission acts in an administrative capacity and the trial court, on appeal, determines, on the basis of the record, whether substantial, reliable evidence exists to reasonably support the commission's decision. Strong v. Conservation Commission,28 Conn. App., 435,440, 611 A.2d 427, cert. granted, 224 Conn. 902, 615 A.2d 1046
(1992), appeal dismissed, 226 Conn. 227, 230, 627 A.2d 431 (1993).
"The court must review the record to determine if there exists a logical basis for the facts found and the conclusions reached by the commission; if substantial evidence in the record supports any valid reason for denying [Avalon's] permit application, the court must sustain the decision of the commission." Samperi v. Inland Wetlands Commission,
supra, 226 Conn. 588-89. "The substantial evidence rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication." (Internal quotation marks omitted.) Barnett v. Board ofEducation, 232 Conn. 198, 211, 654 A.2d 720 (1995).
The commission adopted resolution #0300-18WET, dated March 23, 2000, in which it states its reasons for denying Avalon's November 24, 1999 permit application. In the resolution, the commission states six reasons for denying Avalon's application. The commission states, in its first four reasons, that it evaluated impacts on the wetlands and watercourses of Avalon's application, in accordance with § 10.2.a of Wilton's Inland Wetlands and Watercourses regulations, and determined that the loss of the spotted salamander, an obligate wetlands species, from the site "will reduce the biodiversity of the on-site wetland and the wetland an watercourse immediately adjacent to the parcel." In considering § 10.2.d of the regulations, the commission found the loss of the salamander population on-site and the decrease in biodiversity to both on-site and off-site wetlands to be an irreversible and irretrievable loss of wetland and watercourse resources. The commission also reviewed § 10.2.e of the regulations, which requires the commission to consider the degree of injury to or interference with wildlife and their habitat, both on-site and off-site of the area to be developed. After hearing the expert testimony, the commission concluded that Avalon's development would result in the loss of the salamander population both on-site and in the off-site vernal pool/pond. Section 10.2.f of the regulations requires the commission to consider the environmental impact CT Page 852 of the proposed regulated activity, including the effects on the inland wetland's and watercourse's ability to support desirable biological life. The commission found that, because the spotted salamander population comprises the more complex biologic community, the loss of this species will necessarily affect the overall biologic community.
In reaching these conclusions, the commission relied on a letter from the DEP, in which it was established that wetland wildlife is part of the regulated resources. The commission also relied on testimony by Dr. Michael Klemens as well as knowledge gained by director Sesto and commissioner Wallis by attending a conference entitled "Wetlands Wildlife: Conservation Regulation." At the February 24, 2000 meeting, the commission's chairman read a letter dated February 20, 2000 from Hank J. Gruner, a herpetologist involved with the conservation and management of amphibians and reptiles in the northeastern United States. The purpose of this letter was to clarify breeding habits of the female spotted salamanders, as these breeding habits were presented to the commission by Avalon's expert.
Avalon's argument is that there is insufficient evidence in the record to support the commission's conclusions. Avalon appears to argue that the court should focus on the fact that the commission failed to rely on Avalon's experts, George Logan and Jennifer Beno, who testified that the fifty and one hundred foot buffers established in Wilton's regulations more than adequately protect any spotted salamander population that may exist at the site. Mr. Logan concluded that, without some idea of how productive and diverse the salamander activity was in the area, Wilton ran the risk of overregulating in an area that' was not shown to be an optimal breeding ground.
The commission noted that Mr. Logan's findings were based on review of Dr. Klemen's testimony given during the hearings on Avalon's initial permit application and interviews he conducted with the people from Soils Science and Environmental Services, Inc., specifically Jennifer Beno, who visited the site in May, while Dr. Klemen's report was based on a site visit in September. The commission farther recognized that the experts who testified agreed that the methodology of the testing used at the site to determine the salamander population was less than optimal.
Based on the experts' testimony and the experience of members of the commission, the last two reasons given by the commission for denying Avalon's permit application focus on § 10.2.g of Wilton's Inland Wetlands and Watercourses regulations which calls for mitigation of the decrease in the biodiversity of the wetlands by the development and § 10.3 of the regulations, which calls for feasible and prudent alternatives. The commission cited Avalon's failure "specifically to CT Page 853 demonstrate that there exists no feasible and prudent alternative which would have a less or no impact" on the salamander population or "that their destruction is unavoidable." The commission also specifically discussed an alternative that Avalon could pursue in examining the site at an appropriate time of the year to substantiate Avalon's position "that the spotted salamander population or "that their destruction is unavoidable." The commission also specifically discussed an alternative that Avalon could pursue in examining the site at an appropriate time of the year to substantiate Avalon's position "that the spotted salamander population does not exist or is in such small numbers as to be terminal."
There is substantial evidence in the record to support the commission's finding that Avalon's development would impact the biodiversity of the wetlands and watercourses at the site by causing an impact on the upland habitat of the spotted salamander, an obligate wetlands species. Avalon failed to submit evidence to rebut the expert testimony before the commission that the salamander population at the site, while stressed, could recover if less intense development than that proposed by Avalon were undertaken at the site. The record supports the commission's decision and Avalon's appeal is denied.
 CONCLUSION
In reviewing the record, statutes and municipal regulations, the court finds that the defendant commission had the requisite authority to review and approve the plaintiff's revised wetlands permit application. The court farther finds that the commission evaluated the plaintiff's application's impacts on the wetlands and watercourses within its jurisdiction and, based on substantial evidence in the record, found reliable evidence that a threat to the salamander population on the subject property exists and that this threat impacts the wetlands and watercourses over which the commission had jurisdiction. Accordingly, the court denies the plaintiff's appeal from the commission's decision denying the plaintiff's permit application.
By the Court
Munro, J.